IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2019 Session

## IN RE JOSHUA S.

**Appeal from the Juvenile Court for Hamblen County**
**No. J170015        Janice H. Snider, Judge**

_____

**No. E2018-01742-COA-R3-PT**
_____

Daniel S. ("Father") and Kimberly T. ("Mother") appeal the August 27, 2018 order of the Hamblen County Juvenile Court ("Juvenile Court") terminating their parental rights to the minor child, Joshua S. ("the Child"). Upon petition of the Tennessee Department of Children's Services ("DCS"), the Juvenile Court terminated the parents' rights on the grounds of substantial noncompliance with the permanency plan and failure to manifest an ability and willingness to assume custody or financial responsibility for the Child. The Juvenile Court also terminated Mother's parental rights on the ground of persistent conditions and Father's parental rights on the ground of abandonment by wanton disregard. Upon its determination that grounds existed to terminate the parents' rights to the Child, the Juvenile Court determined that termination of both parents' rights was in the best interest of the Child. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Whitney Bailey, Kingsport, Tennessee, for the appellant, Daniel S.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Kimberly T.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

On January 31, 2017, the Juvenile Court entered an order removing the Child from Mother's custody and placing the Child into the custody of DCS, following an altercation that occurred at the home where Mother was residing. At the adjudicatory and dispositional hearing on March 22, 2017, both Mother and Father waived their adjudicatory hearing, stipulating that the Child was dependent and neglected due to Mother's "drug abuse and lack of supervision" and Father's "homelessness, lack of employment, and unavailability." The Juvenile Court ordered that the Child would remain in the legal and physical custody of DCS.

On March 22, 2017, the Juvenile Court entered an order establishing the Child as "the legitimate child of [Father]." The Child remained in DCS custody until January 31, 2018, when DCS filed its petition to terminate the parental rights of Mother and Father to the Child. The case proceeded to trial on June 27, 2018, in which testimony was proffered from April Hensley, the child's DCS case manager; Mother; and the foster parent.

During trial, Ms. Hensley testified regarding the development of the permanency plan on February 13, 2017. The permanency plan required that both Mother and Father obtain and maintain stable housing, complete parenting classes, resolve all pending legal issues, refrain from incurring new criminal charges, obtain and maintain a legal source of income, complete a mental health assessment and all recommendations therefrom, and develop an appropriate daycare plan if the Child is placed in their care. Additionally, Father would need to establish paternity of the Child. Mother was also to comply with random drug screens and pill counts and complete an alcohol and drug assessment and follow all recommendations.

Ms. Hensley testified that it was sometimes difficult to contact Mother because Mother changed her phone number several times. Ms. Hensley testified that Mother lived with the maternal grandmother throughout a majority of the case. Ms. Hensley stated that she had concerns with grandmother's own drug issues. According to Ms. Hensley, the grandmother had tested positive for different substances in the past and had provided her with only an outdated prescription for some of the substances. Ms. Hensley also testified that the initial stabbing incident, which ultimately led to the Child's removal, occurred at the grandmother's home.

Ms. Hensley testified that she submitted an application for funding to cover the expense of a mental health assessment, alcohol and drug assessment, and parenting assessment for Mother. Those requests were approved for funding to allow Mother to receive services. Mother completed her parenting assessment on July 24, 2017, with

Omni Community Health. The assessment recommended that case management assist Mother in establishing stability and finding acceptable housing. The assessment further recommended that Mother complete eight hours of parenting classes, medication management classes, drug education classes with a focus on relapse prevention, and six hours of individual therapy. According to Ms. Hensley, Mother did not complete parenting classes. Ms. Hensley testified that she found Mother a parenting education class with Broken Arrow that Mother could attend for free. Ms. Hensley testified that she assisted Mother in scheduling an appointment with Broken Arrow, but to her knowledge, Mother had not attended the parenting education class.

Mother also completed her mental health assessment with Covenant Counseling and Consultation Services ("CCS") on January 29, 2018. The assessor observed that Mother appeared to be engaged throughout the interview and answered the questions to the best of her ability. Following the interview, the assessment recommended that Mother complete an alcohol and drug assessment and attend intensive outpatient treatment for "co-occurring treatment regarding addiction, grief and depressive symptoms." The assessment stated that counseling and medication management may assist Mother with her depression and anxiety. In the assessment, the assessor also instructed that the counseling Mother received should address parenting and coping skills and educate Mother regarding community resources.

During trial, Ms. Hensley was unable to recall the date of Mother's alcohol and drug assessment, but a letter from the services coordinator at New Hope Recovery Center stated that Mother had attended a "pre-screening" appointment on March 6, 2017, which had consisted of a clinical alcohol and drug assessment. The letter further stated that intensive outpatient treatment had been recommended for Mother. According to Ms. Hensley, Mother subsequently attended an intake appointment on March 13, 2017. Ms. Hensley explained that Mother attended intensive outpatient treatment through Health Connect, but Mother's services were discontinued after Mother failed to comply with treatment. Ms. Hensley testified that on July 18, 2017, she asked Mother to go to a rehab facility, but Mother declined, stating that she did not need rehab.

The record reflects that Mother failed several drug screens from March 2017 to September 2017. On March 24, 2017, Mother tested positive for THC, methamphetamine, amphetamines, and methadone. On April 19, 2017; April 27, 2017; and June 30, 2017, Mother was positive on a drug screen for THC. On June 22, 2017 and September 7, 2017, Mother tested positive for methamphetamine, amphetamines, and THC. Mother failed to comply with a drug screen request from Ms. Hensley on September 14, 2017, admitting that she would fail.

Mother entered residential treatment at CCS for her alcohol and drug issues on October 5, 2017. The residential treatment Mother received at CCS consisted of "Integrated Services for Substance Abuse and Mental Health Problems." Mother

ultimately completed that treatment and was discharged on November 2, 2017. Upon Mother's release from CCS, Mother was instructed to attend parenting classes and aftercare appointments soon after her release from CCS in order to "keep [Mother] focused on her recovery and to get her the therapy and potential medication she needs." The CCS aftercare plan also recommended that Mother attend AA/NA meetings regularly and obtain a sponsor. Ms. Hensley testified that she assisted Mother in setting up the follow-up intensive outpatient treatment at Health Connect America on April 12, 2018. Prior to that time, Ms. Hensley stated that she provided Mother with a list of places where she could attend group therapy and AA/NA meetings prior to getting Mother into her intensive outpatient treatment.

Ms. Hensley provided Mother with drug screens after her discharge from CCS. Mother tested positive for THC on December 8, 2017. Mother tested positive for amphetamines, methamphetamine, and THC on December 19, 2017. According to Ms. Hensley, Mother stated that she had been sick and had been taking "night-time medication." Specifically, Ms. Hensley testified that Mother informed her that Mother had taken "night-time Nyquil" for two days and "acetaminophen PM" for five days due to "sinuses and a headache." Mother was provided another drug screen on January 29, 2018, at which time she tested positive for amphetamines, methamphetamine, and THC. Ms. Hensley testified that following the January 29, 2018 drug screen, Ms. Hensley had contacted Mother for a drug screen "several times," but she was unable to get Mother to come into the DCS office. The record reflects three occasions when Mother refused a drug screen, occurring on May 22, 2018; May 31, 2018; and June 20, 2018. On May 31, 2018, while Mother was in Hamblen County Jail, Ms. Hensley attempted to obtain a hair follicle drug screen from Mother, but Mother refused.

In May 2018, Mother was arrested on drug-related charges and found guilty of possession of a schedule six drug and possession of drug paraphernalia. Mother was found to be guilty of those charges and sentenced to eleven months and twenty-nine days probation. Mother last visited the Child on June 20, 2018, and had consistently visited the Child throughout the case. Ms. Hensley acknowledged that the visits between Mother and the Child went well.

Ms. Hensley testified that she had difficulty contacting Father throughout the case. Father was residing in Florida when the Child was placed into DCS custody. In early March, Father came to Tennessee, and Ms. Hensley met with Father on March 29, 2017. Father was living different places from March to August of 2017. During that time, Ms. Hensley stated that she was mostly trying to locate Father. Ms. Hensley was able to locate Father on August 3, 2017, while he was incarcerated in the Hamblen County Jail. Father pled guilty on August 3, 2017, to possession of a schedule two drug and joyriding. Ms. Hensley later located Father incarcerated again on October 5, 2017, at which time Father entered a guilty plea to disorderly conduct and criminal impersonation. Father subsequently pled guilty on October 18, 2017, to theft.

Ms. Hensley explained that while Father was incarcerated, she was able to schedule a clinical mental health assessment that included an alcohol and drug component. The assessment was scheduled for November 6, 2017, but Father was released from jail before they could provide the service. Father subsequently was incarcerated in Polk County, Florida from December 25, 2017, through January 30, 2018. He was transferred from Florida back to Hamblen County Jail where he has remained since that time. Ms. Hensley testified that she met with Father two times since the filing of the termination petition on January 31, 2018.

Ms. Hensley testified that she visited Father in jail on April 19, 2018, in order to get Father to sign paperwork. According to Ms. Hensley, Father refused to sign the paperwork and became aggressive and upset, which resulted in the visit ending prematurely. Ms. Hensley explained that Father was "very aggressive" in the conversations she had with him, and he would inform Ms. Hensley that he did not need her to tell him how the system worked. Ms. Hensley stated that she was unaware Father had an appointed attorney until recently and had not contacted Father's attorney when communication with Father broke down. Ms. Hensley acknowledged that Father had been in foster care as a child.

Ms. Hensley testified that Father had established paternity of the Child but had not completed any other requirements on his permanency plan. According to Ms. Hensley, Father had visited with the Child three times since the Child had been in DCS custody, and he had not visited since April 20, 2017. Ms. Hensley acknowledged that the visits went well, that Father appeared to have a bond with the Child, and that Father parented appropriately during those visits. Ms. Hensley testified that she did not observe the Child to be scared of Father during visits.

Ms. Hensley testified that she spoke to Father regarding his housing situation and his job status. Because Father informed her that he had injured his back, Ms. Hensley spoke with him about applying for disability benefits. However, Father did not have a driver's license, birth certificate, or social security card. Ms. Hensley acknowledged that she did not assist Father in obtaining this documentation.

Father failed three drug tests in March and April 2017 for THC. Father also tested positive for oxycodone during the April 19, 2017 drug test. According to Ms. Hensley, Father had informed her that he had a prescription for the medication but never provided her with proof of that prescription. Ms. Hensley testified that she tried getting Father to go to the MATS shelter at one point but that Father had told her that you had to be clean to get into MATS, and he was not clean. She also stated that she referred Father to other local shelters until they could find something more permanent.

Ms. Hensley met with Mother on December 8, 2017. Ms. Hensley testified that Mother had informed her of an incident that occurred between Mother and Father when Father kidnapped Mother and drove her to Florida. According to Ms. Hensley, Mother described Father choking her, slamming her head into a window, knocking her out, and driving her to Florida. Mother told Ms. Hensley that Mother and Father had a car accident on the way to Florida, and Mother was able to escape at that time. Mother told her that the incident had happened recently, and she had just returned from Florida on December 8, 2017.

Ms. Hensley testified that the Child likes his current foster home, where he had resided for nearly six months at the time of trial. According to Ms. Hensley, the foster parents are interested in adopting the Child. Ms. Hensley testified that another option for permanency for the Child was with his maternal grandfather in Florida who also wishes to adopt the Child. According to Ms. Hensley, the process for approval of the grandfather's home had been initiated pursuant to the Interstate Compact on the Placement of Children.

The Child's current foster mother, A.B. ("Foster Mother"), testified that the Child had been in her home since January 12, 2018. Her husband and another foster child also reside in the home. Foster Mother testified that she would like to adopt the Child if that became an option. According to Foster Mother, the Child had "trauma based issues," for which he was in counseling but that the Child was doing very well overall. When asked to explain the Child's "trauma based issues," Foster Mother explained that the Child is afraid of many things, including violence. According to Foster Mother, the Child told her that he had observed violence in the home with his Mother and Father. The Child had stated to Foster Mother that Mother had been stabbed, which the Juvenile Court admitted only for consideration of the Child's state of mind. The Child had expressed a fear of weapons and of someone breaking into their home and hurting him. Foster Mother testified that the Child also asked whether Father would have access to his weapons when he is released from jail or whether they remained in the shed.

Mother testified at trial that she had been living with a family friend for two and a half weeks that she met after she was released from rehab. She stated that she had not informed Ms. Hensley of her current living situation because she had only talked briefly with her since she got out of jail on June 12, 2018. Mother testified that she currently is looking for employment and had an interview scheduled for the following day. Mother had paid $10 per week for child support for the Child according to an agreement with the State of Tennessee. She proffered a letter from the Department of Human Services that stated she is current with her child support.

Mother explained that she refused to comply with the May 31, 2018 hair follicle drug screen while incarcerated because the facility was nasty, her hair is very long, she had been sleeping on a small mat on the floor, her hair had been touching things in the

facility, and she was in jail with many other people with drug problems. On the refused May 22, 2018 drug test, Mother claims that she never personally spoke with Ms. Hensley. On June 20, 2018, she refused a drug screen because she had admitted to Ms. Hensley that she would fail it for THC and did not want to get in trouble with probation.

Mother stated that Ms. Hensley had not provided her with contact information or any literature on Broken Arrow, and if she had, she would have already completed the classes. Mother testified that Ms. Hensley had not provided her any assistance in seeking appropriate housing.

Following trial, the Juvenile Court entered an order on August 27, 2018, terminating Mother's and Father's parental rights to the Child. The Juvenile Court found that clear and convincing evidence supported termination of Mother's parental rights on the grounds of substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for the Child. The Juvenile Court also found that clear and convincing evidence existed to support the grounds of substantial noncompliance with the permanency plan, failure to manifest an ability and willingness to assume custody or financial responsibility for the Child, and abandonment by wanton disregard against Father. Applying the same clear and convincing standard, the Juvenile Court determined that termination of both parents' rights was in the Child's best interest. Specifically, the Juvenile Court found and held as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

[The Child] was removed from his mother's home into DCS custody on January 31, 2017, following an incident in the mother's home on January 20, 2017, wherein the mother and an uncle were allegedly stabbed by another female in the home who was high on methamphetamine. [The Child] did not witness the stabbing but was present in the home when it occurred. It was further alleged that law enforcement also found another female sleeping in another bedroom along with a plethora of illicit drugs under her bed. The child's mother tested positive for THC, benzodiazepines, methamphetamine and amphetamine. The child's father was not in the home and is believed to have been in Florida at the time.

Following his removal into state custody [the Child] was in placed in a D.C.S. foster home, where he remains to this date.

\* \* \*

## GROUND I
## SUBSTANTIAL NON-COMPLIANCE WITH PERMANENCY PLAN

<u>(Applies to both parents)</u>
<u>T.C.A. §36-1-113(g)(2) and §37-2-403(a)(2)</u>

\* \* \*

Both parents attended the adjudicatory hearing on March 22, 2017, and stipulated dependency and neglect due to the mother's drug abuse and lack of supervision of her child, and the father's homelessness, unemployment and unavailability to care for his child.

The initial Permanency Plan in this case was created on February 13, 2017, and gave [Mother and Father] until August 13, 2017, to complete the plan steps toward reunification with a parent or a relative placement. This plan required the parents to complete the following steps designed to remedy the conditions for removal and reunify this family:

1.      Parents were to complete an alcohol and drug assessment and follow all recommendations of same.

2.      Parents were to pass all drug screens and pill counts.

3.      Both parents were to obtain/maintain safe and stable housing.

4.      Both parents were to complete parenting classes.

5.      Parents were to resolve their legal issues in the criminal justice system and refrain from incurring new charges.

6.      Parents were to complete a mental health evaluation and follow all recommendations of that evaluation.

7.      Parents were to devise and implement an appropriate day care plan if child was returned to them at a time when they were employed.

8.      Parents were required to maintain a legal source of income.

9.      [Father] was to take all steps to establish paternity of [the Child].

This Court finds that the requirements of the permanency plan for the parents were reasonably related to the grounds for removal and the goal of the parents achieving a stable lifestyle free of criminal activity and

substance abuse which would permit re-unification with their child. The Court specifically finds that [DCS] has complied with the requirements of T.C.A. §37-2-403(a)(1)(B)(ii) in this case.

The mother attended the permanency plan ratification hearing on May 15, 2017, and she was provided a copy of the Criteria for Termination of Parental Rights on that date. She voiced no objection to any of the plan steps or responsibilities assigned to them. The father did not attend the permanency hearing and did not sign or approve the permanency plan. He was represented by counsel at the permanency plan ratification hearing on May 15, 2017, who voiced no objection to the plan on behalf of [Father].

The mother completed her assessments and an inpatient drug rehabilitation program at CCS but failed to complete the follow-up Intensive Outpatient Program or to remain drug free following rehab. She consistently tested positive for various illicit drugs throughout 2017. She was then subsequently arrested on drug related charges on May 26, 2018. The mother failed to complete any of the other steps on her Permanency Plan.

In spite of the case manager's efforts to schedule assessments for the father, these were never completed. The father was in and out of jail during 2017 but did attend a few visits with Joshua. The case manager, Ms. Hensley, testified to her difficulty in keeping up with [Father's] whereabouts. In April, 2018, she did go to visit him in the Hamblen County jail and stated that he became aggressive and upset with her, so Ms. Hensley terminated the meeting. Afterward the case manager did not have any additional successful meetings with [Father]. The only plan step completed by the father was legally establishing paternity of [the Child].

The father has great disdain for the efforts of DCS to help him comply with the requirements of the Permanency Plan. The Court understands his frustration and agrees that this case manager might have been more persistent in her efforts to locate and contact [Father]. On the other hand, it does not appear that [Father] took any affirmative action to maintain contact with the case manager or attempt completion of any plan steps on his own. Significantly, he could not seem to refrain from criminal activity or remain out of jail long enough to work this plan.

For these reasons the Court finds by clear and convincing evidence that both these parents have failed to substantially comply with the reasonable requirements of the Permanency Plans in this case.

GROUND II
PERSISTENT CONDITIONS
(Applies to the mother)
T.C.A. § 36-1-113(g)(3)


At the time of the T.P.R. hearing, this child had been in state custody for almost seventeen (17) months. He was removed from his mother due to her drug use, her unstable lifestyle, domestic violence, and lack of appropriate housing.

\* \* \*


During the 17 months following removal of [the Child] from her custody, [Mother] has failed to remain drug free or to establish an appropriate, stable residence of her own. She continued to abuse various illicit drugs throughout 2017 and 2018 as evidenced by the multiple drug screen results in evidence as Exhibit 10. The mother was arrested on new drug related charges on or about May 26, 2018, and remained in jail on those charges until 2 weeks prior to the date of the T.P.R. trial. At the time of trial, she was living with a friend while seeking employment. In short, she has failed to make any lasting positive changes in her lifestyle that would enable her to resume her duties as a safe, appropriate parent for this child.

The Court finds by clear and convincing evidence that the conditions which led to the child's removal continue to persist, and there is little likelihood that [Mother] will make such an improvement in her life that this child could be safely returned to his mother's care in the foreseeable future without subjecting him to a risk of further neglect. Continuation of the parent-child relationship greatly diminishes [the Child's] chances of integration into a permanent home in the near future.


GROUND III
FAILURE TO MANIFEST AN ABILITY TO PARENT
(Applies to both parents)
T.C.A. § 36-1-113(g)(14)


\* \* \*


This child was in state custody for one year at the time the Petition to terminate his parents' rights was filed. During the period following [the Child's] removal into state custody, neither of his parents have made lasting

- 10 -

changes to their circumstances that would enable them to parent [the Child]. His father continued to engage in criminal activity [throughout] 2017. He has remained incarcerated for much of the time [the Child] has been in DCS custody. [Father] visited his son several times during the year prior to the filing of this Petition, and those visits went well. Case manager Hensley confirmed that [the Child] appeared bonded with his father. Unfortunately, [Father] otherwise failed to function as a parent to his child, contribute any form of financial support for [the Child], or establish a home for this child since [the Child] entered state custody.

[Mother] initially made some effort to correct the conditions that resulted in her child's placement in state custody. However, she continued to use illicit drugs before and after she completed an inpatient rehabilitation program. She failed to follow an aftercare plan that would have helped her to remain drug free. Although [Mother] did visit her child and paid the nominal amount of $10 monthly in support, she did not make improvements in her living arrangements or create a stable living environment for [the Child]. [Mother] continued to involve herself in an unhealthy, dysfunctional relationship with [Father] and with other inappropriate men that culminated in the tragic kidnapping episode in late 2017 detailed on page 9 of this order.

Neither parent contributed more than nominal financial support for the children during the 12 months prior to the filing of the Petition to Terminate Parental Rights.

If past history is an indicator, then returning [the Child] to the custody of either of his parents at this time would subject him to a likelihood of drug exposure and neglect subjecting him to substantial psychological harm detrimental to his welfare.

The Court finds by clear and convincing evidence that both of these parents have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.

GROUND IV
ABANDONMENT BY INCARCERATED PARENT-WANTON DISREGARD
T.C.A. §36-1-113(G)(1), 36-1-102(1)(A)(iv) and all applicable law
(Applies to the father)

* * *

- 11 -

[Father] has an extensive criminal history in multiple jurisdictions dating back to 2014 (see Exhibit 13). His most recent term of incarceration within the four (4) months preceding the filing of this Petition began on December 25, 2017, and he was incarcerated again at the time this Petition to Terminate Parental Rights was tried. Specifically, [Father] was convicted of the following criminal offenses since the birth of his child and prior to the filing of this Petition:

1. Grand theft – plea of guilty in Polk County, Florida, on September 2, 2014.

2. On August 3, 2017, father entered a plea of guilty to Possession of a Schedule II controlled substance (Methadone) and Joyriding that occurred on July 24, 2017.

3. On October 5, 2017, father entered a plea of guilty to Disorderly Conduct and Criminal Impersonation for incidents that occurred on October 3, 2017.

4. On October 18, 2017, father pled guilty to theft for incidents that occurred on October 9, 2017.

In April, 2018, [Father] was held in Polk County, Florida, on charges of being a fugitive from justice. Court records indicate those charges were dismissed but with the notation "held, picked up." It is unclear whether he was picked up and returned to Tennessee or released in Florida.

Court records introduced as Exhibit 13 do not indicate the nature of the charges for which [Father] was incarcerated on the date of this trial.

There is also evidence that [Father] has a history of drug abuse. When drug tested in early 2017, he was positive for THC on March 24, 2017, for Oxycodone (without a valid prescription) and THC on April 19, 2017, and again for THC on April 27, 2017.

Finally, a significant episode occurred between the mother and father in December, 2017, wherein the father is accused of kidnapping the mother after choking her and hitting her head against a car window. He then drove the mother allegedly against her will to Florida. While in transit, the father wrecked the vehicle and mother escaped. It requires no great stretch of the imagination to find that this conduct exhibited no concern for the welfare of [the Child] by the father. These parents

- 12 -

continued to have a dysfunctional, destructive relationship during 2017 that would be highly detrimental to the welfare of their child if he were returned to their custody.

This Court finds by clear and convincing evidence that [Father's] lifestyle, drug abuse, and involvement with the criminal justice system demonstrate wanton disregard for the welfare of his child in such a manner as to constitute abandonment of his child within the meaning of T.C.A. §36-1-113(g)(1) and §36-1-102(1)(A)(iv).

\* \* \*

GROUND V
ABANDONMENT - FAILURE TO PROVIDE A SUITABLE HOME
(Applies to [Mother])
T.C.A. §36-1-113(g)(1), 36-1-102(1)(A)(ii)

[The Child] was removed into DCS custody on January 31, 2017.

\* \* \*

Case manager Hensley was obviously confused and overwhelmed when she testified concerning her efforts to assist the parents in this case. She was unsure of many important details of her efforts to assist these parents and unclear as to the timing or specifics of others. When asked about her efforts to help [Mother] during the relevant four (4) month period between January 31, 2017 and April, 2018, Ms. Hensley was unable to affirmatively articulate or detail her efforts to assist [Mother] in meeting the requirements of the permanency plan or to establish a suitable home for [the Child] during that period of time. Interestingly, there was no Affidavit of Reasonable Efforts submitted at trial that would have helped clarify this issue. The Court makes note of an excerpt from the Permanency Order wherein [Mother] commended Ms. Hensley for her "hard work" on this case. Unfortunately, this Court is unable to glean the details or a time frame of what that hard work consisted of or how it assisted this mother in achieving her goal of a suitable home for this child. There is one reference in the trial testimony that Ms. Hensley provided the mother with information on Section 8 housing, for which the mother was not eligible. Sadly, it appears from the trial evidence that very little was accomplished by either party . . . during the first eight to ten months following the removal of this child.

- 13 -

Based upon the proof at trial, the Court does not have sufficient evidence to find that DCS made reasonable efforts to assist this mother to establish a suitable home for her child during the four months following the child's removal to state custody. DCS failed to carry [its] burden of proof on this ground and Ground V of the Petition is dismissed.

## BEST INTERESTS OF CHILDREN

* * *

T.C.A. §36-1-113(i) sets out a non-exhaustive list of factors to guide the Court's best interest analysis. Looking at these factors the Court finds that: [The Child] currently resides in a DCS foster home where he is well loved and cared for. Neither parent has made such an adjustment of their circumstances or conduct as to make it safe and in the child's best interest for him to be returned to their custody. Although the parents did visit with [the Child], their relationship with him has been interspersed with periods of unavailability, incarceration and drug abuse. The parents did have a relationship with [the Child] but their instability is an unhealthy environment for a young child's growth and emotional development. [The Child] appears to be well settled into his current foster home. This home as well as a potential placement with his maternal grandfather are prospective permanent adoptive homes offering the stability his parents are unable to provide in the foreseeable future. The mother was only released from jail on June 12, 2018 and had not yet obtained employment or a stable residence of her own. The father is still incarcerated with an anticipated release date of September, 2018. His future circumstances are unknown. Consequently, the ability of either parent to financially support [the Child] is speculative.

In spite of the Court's inability to find that DCS . . . fully met its burden of making reasonable efforts to help the mother establish a suitable home for [the Child] during the four month period following removal, the case manager did assist the mother in other ways. Her efforts . . . to assist the father were complicated by his lack of adequate contact information, instability, and incarcerations. The other factors set forth in T.C.A. 36-1-113(I) clearly mandate a best interest finding in favor of termination of these parents' rights. For all of the reasons set forth previously, the Court finds by clear and convincing evidence that termination of [Father's] and [Mother's] parental rights is in best interests of their child.

Mother and Father timely appealed the Juvenile Court's judgment.

- 14 -

## Discussion

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred by finding by clear and convincing evidence that termination of the Mother's parental rights was in the best interest of the Child. Likewise, Father raises on appeal the single issue of the Juvenile Court's best interest determination as to his parental rights. DCS has raised the following additional issue for our review: whether the Juvenile Court erred by finding that DCS had proven by clear and convincing evidence that grounds existed for termination of the parents' rights.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

---

[3] Tenn. Code Ann. § 36-1-113(i).

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Four grounds for termination are implicated in this appeal, and we will address each of those separately. As pertinent, Tennessee Code Annotated § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

- 18 -

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

We first address whether the Juvenile Court erred by finding the ground of abandonment by wanton disregard against Father. Regarding wanton disregard, Tennessee Code Annotated § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Father was incarcerated within the four months preceding the termination petition. The Juvenile Court found that Father had been convicted of grand theft, possession of a schedule II drug, joyriding, disorderly conduct, criminal impersonation, and theft, all of which occurred after the Child was born. During the time the Child was in DCS custody, Father had failed three drug screens. Father had tested positive for THC on all three drug screens and had tested positive for oxycodone on one occasion in April 2017 without providing a valid prescription.

The Juvenile Court was concerned with an incident occurring between Mother and Father, in which Father was accused of choking Mother, hitting her head against a car window, and kidnapping her. During this incident, Father drove Mother to Florida allegedly against her will. Mother was able to escape when Father wrecked the vehicle.

We agree with the Juvenile Court when it found by clear and convincing that Father's "lifestyle, drug abuse, and involvement with the criminal justice system" demonstrate Father's wanton disregard for the Child's welfare. We therefore affirm the Juvenile Court's finding that the ground of abandonment by wanton disregard was established by clear and convincing evidence.

We next address whether the Juvenile Court erred by finding the ground of substantial noncompliance with the permanency plan against Mother and Father. Concerning substantial noncompliance with the permanency plan, Tennessee Code Annotated § 36-1-113(g)(2) provides:

- 19 -

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

The Juvenile Court found that the permanency plan requirements were reasonably related to the reasons for removal and the goal of the parents achieving a "stable lifestyle free of criminal activity and substance abuse." Under the permanency plan, the parents were each required to: (1) maintain safe and stable housing, (2) complete parenting classes, (3) resolve all pending criminal charges and refrain from incurring any new criminal charges, (4) complete a mental health evaluation and comply with all recommendations, (5) create an appropriate daycare plan for the Child if he were returned to the parents' custody, and (6) maintain a legal source of income. Additionally, Father was required to establish paternity of the Child. Mother was also required to complete an alcohol and drug assessment and follow all recommendations and to comply with random drug screens and pill counts.

Mother attended a mental health assessment in January 2018, but the record is unclear whether Mother received a copy of those results. Although an appointment was scheduled, Mother did not attend parenting classes. Throughout 2017, Mother failed several drug screens and refused to comply with one drug test prior to seeking treatment for alcohol and drugs. Mother did eventually complete an alcohol and drug assessment and attended a residential treatment facility for approximately twenty-eight days from October 5, 2017 through November 2, 2017. Mother was successfully discharged from that program with instruction to continue her recovery program by attending aftercare appointments, parenting classes, and AA/NA meetings. Unfortunately, after her release from treatment, Mother failed to attend her aftercare appointments, relapsed, and failed drug screens for illegal substances, including methamphetamine, amphetamine, and THC. Additionally, Mother refused to comply with requests for at least three drug screens following treatment. Following her release from treatment, Mother also incurred new criminal charges and was convicted of drug-related charges of possession of a schedule six drug and possession of drug paraphernalia. We determine that the evidence in the record on appeal does not preponderate against the Juvenile Court's findings relevant to its finding that Mother had not substantially complied with the permanency plan requirements and that these findings rise to the level of clear and convincing evidence. We therefore affirm this ground as to Mother.

Regarding Father, he completed the requirement of establishing paternity of the Child on March 22, 2017, when the Juvenile Court entered an order establishing Father to be the father of the Child and directing issuance of a new birth certificate reflecting the parental relationship and the Child's name change. Unfortunately, Father completed no other requirements of his permanency plan. Father failed to attend a mental health assessment or parenting classes. Ms. Hensley had difficulty reaching Father during most

of the case. According to Ms. Hensley, Father did not have a stable home and moved around from place to place. Father continued to participate in criminal activities which lead to further arrests and criminal convictions. The record reflects that Father was unable to obtain employment or apply for disability benefits due to a lack of documentation, including his social security card, birth certificate, or a driver's license. As to Father, the evidence presented and the record before us does not preponderate against the Juvenile Court's finding that Father had not substantially complied with the requirements of the permanency plan, and this proof satisfies the clear and convincing standard. We therefore affirm this ground as to Father.

We next address whether the Juvenile Court erred by finding the ground of persistent conditions against Mother. As to persistence of conditions, Tennessee Code Annotated § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Regarding this case, the Child was removed from Mother's custody after Mother and her brother were stabbed by her brother's girlfriend. Following that incident, Mother failed a drug screen for THC, benzodiazepines, methamphetamine, and amphetamine. Additionally, illegal drugs were found in the home where Mother and the Child were residing. The Child was home but was not present during the incident. At the adjudicatory hearing, Mother stipulated that the Child was dependent and neglected due to Mother's "drug abuse and lack of supervision."

The Juvenile Court found that during the seventeen months the Child was in DCS custody, Mother had failed to remedy her addiction to drugs and had not established a safe and appropriate home for the Child. Although Mother successfully completed a residential drug treatment program, Mother relapsed following her discharge from the facility; failed to attend the recommended aftercare classes; failed drug screens for

methamphetamine, amphetamines, and THC; and was convicted of drug-related offenses. The Juvenile Court found that Mother had not made any lasting positive changes in her lifestyle that would make it safe for the Child to be returned to her care without subjecting him to the risk of further neglect. Additionally, the Juvenile Court found that continuation of the parent-child relationship between Mother and the Child would greatly diminish the Child's chances of early integration into a permanent home.

Upon review of the record on appeal, we determine that the evidence presented does not preponderate against the Juvenile Court's finding that the conditions leading to the Child's removal from Mother persisted. As did the Juvenile Court, we find this ground was proven by clear and convincing evidence, and we affirm this ground for termination as to Mother.

We next address whether the Juvenile Court erred by finding the ground of failure to manifest an ability and willingness to assume custody or financial responsibility for the Child, which the Juvenile Court found against both Mother and Father. Tennessee Code Annotated § 36-1-113(g)(14) provides as an additional ground for termination:

> (14) A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

As to Mother, the Juvenile Court acknowledged that Mother had made an effort to remedy the reasons the Child was removed from her custody and that Mother had paid a nominal amount of $10 per week in child support for the Child. However, the Juvenile Court found that Mother had not contributed more than nominal financial support for the Child in the twelve months preceding the termination petition. Additionally, as the Juvenile Court found, Mother had continued to use illegal drugs even after completing a program at a residential drug treatment facility. Furthermore, Mother had not established a safe and stable home to which the Child could return.

Regarding Father, he continued to engage in criminal activity and had remained incarcerated for much of the time the Child was in DCS custody. Father had visited with the Child a few times early in the case, and although those visits had gone well, Father had not visited the Child since April 20, 2017. While the Child has been in DCS custody, Father has not paid any child support for the Child and does not have a home in which the Child could go to should Father regain custody. Additionally, Father was incarcerated at the time of trial.

The Juvenile Court found that both parents failed to manifest an ability or willingness to assume custody or financial responsibility of the Child, and if the Child

were returned to either parents' custody, the Child would be subjected to "a likelihood of drug exposure and neglect subjecting him to substantial psychological harm" that would be detrimental to the Child's welfare. Reviewing the record before us, we determine that the evidence does not preponderate against the Juvenile Court's findings in this regard, and this evidence rises to the level of clear and convincing. We affirm the Juvenile Court's judgment regarding this ground for termination of Mother's and Father's parental rights.

Having determined that grounds exist for the termination of Mother's and Father's parental rights, we next address the best interest analysis. Both parents have raised as their only issue on appeal whether the Juvenile Court erred by finding that termination of Mother's and Father's respective parental rights to the Child was in the Child's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

With regard to making a determination concerning a child's best interest, our Supreme Court recently instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Both Mother and Father argue that their rights should not be terminated because DCS failed to provide reasonable efforts to the parents to assist them with reunification. As our Supreme Court has explained:

In a given parental termination case, the best-interest factor regarding DCS's efforts to assist the respondent parent may be determinative, i.e., DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child. Nevertheless, the extent of DCS's efforts remains a factor to be weighed in the best-interest analysis, not an essential element that must be proven in order to terminate the parental rights of the respondent parent.

*In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015).

At trial, Ms. Hensley testified of her efforts to assist Mother. According to Ms. Hensley, she submitted a funding request, which had been approved, to pay for Mother's mental health assessment, alcohol and drug assessment, and parenting assessment. Mother also testified that Ms. Hensley assisted Mother in scheduling those assessments. According to a letter from New Hope Recovery Center, Mother attended a pre-screening

appointment that consisted of a clinical alcohol and drug assessment on March 6, 2017. Mother attended a parenting assessment on July 24, 2017, and a mental health assessment on January 29, 2018. Ms. Hensley also assisted Mother in scheduling an appointment with Broken Arrow on April 12, 2018, for parenting classes, but Mother did not attend.

Ms. Hensley provided Mother with several drug screens throughout the case. Although Mother declined treatment at the time, Ms. Hensley encouraged Mother to attend rehab on July 18, 2017. Mother eventually did attend a residential treatment program at CCS from October 5, 2017, to November 2, 2017. Ms. Hensley testified that she contacted CCS regarding availability to enroll Mother in its program but they needed Mother to call them directly for the application process. Ms. Hensley offered to drive Mother to treatment, but Mother declined. While speaking with a representative at CCS, Ms. Hensley learned of grants that would cover the cost of Mother's treatment. Ms. Hensley informed Mother of the grant available, and Mother filled out the application on her own. Following Mother's discharge from CCS, Ms. Hensley assisted Mother in scheduling intensive outpatient treatment. Ms. Hensley testified that she had provided Mother with a list of places where she could attend group therapy and AA/NA classes prior to getting Mother admitted to an intensive outpatient treatment program in April 2018. Additionally, we note that at a permanency hearing which occurred on May 15, 2017, the court order reflects that Mother had complimented Ms. Hensley for "her hard work."

There were delays in scheduling Mother's follow-up outpatient treatment and mental health assessment, but the record is unclear what caused those delays. Mother testified that she requested a copy of her January 2018 mental health assessment three times but that Ms. Hensley did not provide it to her. Ms. Hensley testified that DCS's usual practice was to provide a copy of the assessment to the parent but she did not know whether she gave Mother a copy. The trial court found that although it had not found sufficient evidence to support a finding of reasonable efforts by DCS to help Mother establish a suitable home for the Child during the first four months following the Child's removal, Ms. Hensley had assisted Mother "in other ways." The record supports this finding.

Similarly, Ms. Hensley detailed her efforts to assist Father. According to Ms. Hensley, she often had difficulty reaching Father throughout the case. At times when she was able to reach Father, Ms. Hensley testified that Father was aggressive toward her during conversations and would often tell her that he knew how the system worked, and he did not need her to tell him. Father presented no evidence to contradict Ms. Hensley's testimony.

Ms. Hensley testified that she had spoken to Father about obtaining employment, but he had informed her that he had injured his back. Ms. Hensley then stated that she had suggested that Father apply for disability benefits if he was unable to work.

However, as the Juvenile Court recognized, Ms. Hensley's efforts with Father were complicated due to his lack of identification documentation and his repeated incarcerations.

Lack of housing has been an issue with Father from the beginning. Ms. Hensley testified that she had spoken to Father about his lack of housing and suggested that he go to a local shelter until she and Father could figure out a more permanent solution. Ms. Hensley specifically suggested the MATS shelter, but Father declined because he stated that he needed to be clean to go to MATS.

Father was incarcerated repeatedly throughout the case. Ms. Hensley had scheduled a clinical mental health assessment, which included an alcohol and drug component, where the assessor would come to Father while he was incarcerated. The assessment was supposed to take place on November 6, 2017, but Father was released from jail before the assessment occurred.

Ms. Hensley's efforts to assist Father were not herculean. Her efforts, however, far exceeded the effort made by Father. The Juvenile Court recognized that although Ms. Hensley could have been more persistent in her efforts to locate Father, Father made no efforts to contact Ms. Hensley or to complete the permanency plan requirements. Instead, Father continued to engage in criminal activity. Father told Ms. Hensley that he did not need her to explain to him how the system works because he already knew. Despite Father's assertions, Father completed only one task on his permanency plan.

After a review of the record on appeal, we find and hold that although DCS's efforts to assist the parents were not herculean, consideration of those efforts as a factor does not weigh heavily enough to prevent the termination of Mother's and Father's parental rights as relevant to Tennessee Code Annotated § 36-1-113(i)(2).

Upon consideration of the remaining best interest factors, the Juvenile Court found that Mother and Father had not made a sufficient adjustment to their respective circumstances to make it safe for the Child to be placed in their care. Mother continued to use illegal drugs and was released from jail on drug-related offenses approximately two weeks prior to trial. The Juvenile Court found that following her release, Mother had not obtained employment or a stable home for the Child. Mother had visited the Child regularly when she was not incarcerated and had paid nominal child support for the Child. Father had continued to participate in criminal activity which led to recurrent incarceration throughout the time the Child was in custody. Father remained incarcerated at the time of trial. Even when Father was not incarcerated, he did not have a home for the Child. Moreover, Father had not visited the Child since April 20, 2017. The Juvenile Court found that the parents' instability would be an unhealthy environment for the Child's growth and emotional development.

Additionally, the Juvenile Court found that the Child was well adjusted in his foster home. The Juvenile Court further found that both the foster home and a family relative have expressed interest in adopting the Child and can offer the Child the stability that the parents are unable to provide.

Upon a review of the record on appeal, we determine that the evidence presented does not preponderate against the Juvenile Court's finding that termination of Mother's and Father's parental rights was in the best interest of the Child and that the evidence satisfies the clear and convincing standard. Therefore, we affirm the Juvenile Court's judgment terminating Mother's and Father's parental rights in its entirety.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs assessed below. The costs on appeal are assessed against the appellants, Kimberly T. and Daniel S., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE